**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **BRIGHTVIEW LANDSCAPES, LLC,** | |
| *Plaintiff*, | |
| **v.** | **Civil Action No: 8:25-cv-02059-DKC** |
| **PETER SACCO and RIVERVIEW COMPANIES NORTHEAST LLC D/B/A RIVERVIEW LANDSCAPES** | |
| *Defendants*. | |

**DEFENDANTS RIVERVIEW COMPANIES NORTHEAST, LLC'S AND PETER SACCO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

**TABLE OF CONTENTS**

**PAGE**

I.   INTRODUCTION ............................................................................................................ 1

II.  FACTUAL BACKGROUND.......................................................................................... 2

    A.   Mr. Sacco ............................................................................................................ 2

    B.   BrightView's Business........................................................................................ 2

    C.   Mr. Sacco's Employment with BrightView........................................................ 3

    D.   Riverview's Business ......................................................................................... 4

    E.   Mr. Sacco's Termination from BrightView and his Employment with Riverview ......... 6

    F.   BrightView Clients' Outreach to Mr. Sacco .................................................... 7

    G.   BrightView's Cease and Desist Letter ............................................................ 9

III. ARGUMENT.................................................................................................................. 10

    A.   BrightView is Not Entitled to a Preliminary Injunction Because It is Not Likely to Succeed on the Merits of its Claims................................................................... 11

        1.   BrightView is Unlikely to Prevail on its Claim for Breach of Contract.............. 11

            a.   The non-compete and non-solicitation clauses in the Agreement are not enforceable........................................................................................... 11

                i.   The restrictive covenants are overbroad as to BrightView's protectable interests. ................................................................................. 11

                ii.  Enforcement of the non-compete covenant would impose an undue hardship on Mr. Sacco. .......................................................................... 16

            b.   Mr. Sacco Has Not Breached the Agreement. ............................................. 17

        2.   BrightView is Unlikely to Prevail on its Claim for Tortious Interference. .......... 20

B.    BrightView is Not Entitled to A Preliminary Injunction Because It Cannot Establish Irreparable Harm if the Injunction Does Not Issue ......................................................... 22

C.    The Balance of the Equities Weighs Against Issuing an Injunction ............................. 25

D.    The Public Interest Weighs Against Issuing an Injunction ........................................... 27

E.    The Court Should Require BrightView to Post a Significant Bond if an Injunction is Issued ............................................................................................................................. 29

IV. CONCLUSION ..................................................................................................................... 30

**TABLE OF AUTHORITIES**

**CASES**                                                                                                           **PAGE**

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon,*
 770 F. Supp. 3d 822 (D. Md. 2025) ....................................................................... 29

*Amazon.com, Inc. v. Moyer,*
 417 F. Supp. 3d 1388 (W.D. Wash. 2019) ............................................................ 15

*Bindagraphics, Inc. v. Fox Grp., Inc.,*
 377 F. Supp. 3d 565 (D. Md. 2019) ....................................................................... 21

*Boisen v. Petersen Flying Serv., Inc.,*
 222 Neb. 239, 383 N.W.2d 29 (1986) .................................................................... 14

*Cynosure LLC v. Reveal Lasers LLC,*
 2022 WL 18033055 (D. Mass. Nov. 9, 2022) ....................................................... 18

*Deutsche Post Global Mail, Ltd. v. Conrad,*
 116 F. App'x 435 (4th Cir. 2004) ........................................................................... 12

*Edelman Financial Engines, LLC v. Butera,*
 2022 WL 2176850 (D. Md. June 16, 2022) ..................................................... 19, 20

*EIS Ultimate Holding, LP v. Huset,*
 2024 WL 4472008 (D. Colo. Sept. 19, 2024) ........................................................ 30

*ForceX v. Technology Fusion,*
 2011 WL 2560110 (E.D. Va. June 27, 2011) ................................................... 22, 23

*Holloway v. Faw, Casson & Co.,*
 572 A.2d 510 (Md. 1990) ........................................................................... 11, 12, 13

*Kelly Servs., Inc. v. Greene,*
 535 F. Supp. 2d 180 (D. Me. 2008) ......................................................................... 1

*KPMG Peat Marwick LLP v. Fernandez,*
 709 A.2d 1160 (Del. Ch. 1998) .............................................................................. 20

*Kumar v. Dhanda,*
 198 Md. App. 337 (2011), *aff'd,* 426 Md. 185, 43 A.3d 1029 (2012) ..................... 17

*Labor Ready, Inc. v. Abis,*
 137 Md. App. 116 (2001) ....................................................................................... 14

*LeJeune v. Coin Acceptors*,
   381 Md. 288, 849 A.2d 451 (2004) ................................................................ 24

*L'Occitane, Inc. v. Trans Source Logistics, Inc.*,
   2009 WL 3746690 (D. Md. Nov. 2, 2009) ..................................................... 28

*Marinelli v. Medco Health Sols., Inc.*,
   951 F. Supp. 2d 303 (D. Conn. 2013) ........................................................... 26

*MCS Services, Inc. v. Jones,*
   2010 WL 3895380 (D. Md. Oct. 1, 2010) ...................................................... 12

*Medispec v, Chouinard,*
   133 F. Supp. 3d 771 ( D. Md. 2015) .............................................................. 11

*Moonracer, Inc. v. Collard,*
   2013 WL 4759262 (E.D. N.C. Sept. 4, 2013) ............................................ 12, 13

*Nicklas Associates v. Zimet*,
   2014 WL 6984138 (D. Md. Dec. 9, 2014) ..................................................... 24

*Parkway 1046, LLC v. U.S. Home Corp.*,
   961 F.3d 301 (4th Cir. 2020) ......................................................................... 17

*Premier Rides, Inc. v. Stepanian*,
   2018 WL 1035771 (D. Md. Sept. 23, 2018). ................................................. 13

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
   575 F. 3d 342 (4th Cir. 2009) ................................................................... 10, 11

*Rimsys, Inc. v. Cohn*,
   2023 WL 7181771 (W.D. Pa. Sept. 15, 2023) ............................................... 29

*Scotts Co. v. United Industries Corp.*,
   315 F.3d 264 (4th Cir. 2002) ......................................................................... 23

*SouthTech Orthopedics v. Dingus*,
   428 F. Supp. 2d 410 (E.D.N.C. 2006) ...................................................... 22, 23

*TTEC Holding, Inc. v. Da Silva*,
   2020 WL 7398775 (D. Colo. Dec. 16, 2020) ............................................ 25, 26

*United Rentals, Inc. v. Davison*,
   2002 WL 31994250 (Md. Cir. Ct. July 23, 2002) .......................................... 17

v

*Universal Engraving, Inc. v. Duarte*,
  519 F. Supp. 2d 1140 (D. Kan. 2007) ................................................................. 29, 30

*Wachovia Ins. Services, Inc. v Hinds*,
  2007 WL 6624661 (D. Md. Aug. 30, 2007) ............................................................. 24

*Wausau Mosinee Paper Corp. v. Magda*,
  366 F. Supp. 2d 212 (D. Me. 2005) ......................................................................... 26

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................ 10, 11

**SECONDARY AUTHORITIES**                                                    **PAGE**

*Employee Agreements Not to Compete*,
  73 Harv. L. Rev. 625 (1960) ..................................................................................... 14

**STATUTES**                                                                **PAGE**

Md. Code Ann., Lab. & Empl. § 3-716(a)(1)(i)(1) ...................................................... 28

Md. Code Ann., Lab. & Empl. § 3-413(c)(1)(ii) ......................................................... 28

## I.  INTRODUCTION

Defendants Peter Sacco ("Mr. Sacco") and Riverview Companies Northeast LLC d/b/a Riverview Landscapes ("Riverview" and collectively with Mr. Sacco, "Defendants"), by and through the undersigned counsel, hereby submit this Memorandum of Law in Opposition to Plaintiff BrightView Landscapes, LLC's (herein "BrightView") Motion for Preliminary Injunction and for Expedited Discovery (the "Motion").

BrightView's request for injunctive relief should be denied because its Memorandum in Support of its Motion for Preliminary Injunction (herein "BV Memorandum") is devoid of credible evidence sufficient to support any of its claims.[1]  BrightView cannot establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, nor that an injunction is in the public interest.  Indeed, BrightView's alleged damages due to the hiring of Mr. Sacco by Riverview are based on nothing more than unfounded speculation.

As shown by the facts and applicable law set out below, BrightView has not met the standard required for the extraordinary relief it seeks in the form of a preliminary injunction.

---

[1]  BrightView's factual allegations cited in the BV Memorandum simply mirror those contained in the Verified Amended Complaint for Injunctive Relief and Damages ("Am. Compl.") signed by David Palmer, Vice President and General Manager.  No foundational facts are presented by BrightView of Mr. Palmer's conclusory assertion that he has "personal knowledge" of the facts alleged, such as via an affidavit or declaration, which are commonly used to support a motion for preliminary injunction.  As such, BrightView's factual allegations should not be accorded the full weight of a witness with first-hand knowledge. *See, e.g., Kelly Servs., Inc. v. Greene*, 535 F. Supp. 2d 180, 188-89 (D. Me. 2008).

1

## II.  FACTUAL BACKGROUND

### A.  Mr. Sacco

Mr. Sacco has been employed in the horticulture and landscape industry his entire professional life.  Ex. 1, Declaration of Peter Sacco ("Sacco Decl.") ¶ 4.  He began his career in 1995 working as the Manager of his family's greenhouse business, Sun Valley Greenhouses, in Esperance, New York, located in Schoharie County.  *Id.* ¶ 4.  Following the sale of the family business in early 2000, Mr. Sacco worked as the Operations Manager for a small landscape company, Northeastern Landscaping, located in Albany, New York.  In his roles as Manager of the family business and Operations Manager at Northeastern Landscaping, Mr. Sacco acquired knowledge of the landscape business and the skills necessary for providing quality customer service and customer retention. *Id.* ¶ 6.  Mr. Sacco resides in Malta, New York, located in Saratoga County, where he shares custody of his eleven-year-old son with his former spouse. Sacco Decl. ¶ 2.

### B.  BrightView's Business

BrightView is one of the nation's leading commercial landscaping companies.  Amended Complaint ("Am. Compl.") ¶ 1.  It is also the largest landscaping company in the country, with estimated annual revenues of nearly $3 billion, and approximately 3% of the national market. Sacco Decl. ¶ 14; Ex. 2, Declaration of Michael Waterman ("Waterman Decl.") ¶ 9.  BrightView provides a wide array of landscaping and maintenance services, including landscape design, development, and maintenance; snow and ice removal; water and irrigation services; tree care; golf course and sports turf maintenance; and multi-location management.  Am. Compl. ¶ 1; Sacco Decl. ¶ 17.  BrightView distinguishes itself in the market as having the capability to provide landscape services that require a significant number of labor hours, expertise in landscape design, and the

2

use of specialized heavy equipment for things such as construction of retaining walls, installation of large turf surfaces, and trimming and removal of trees and large shrubs.  Sacco Decl. ¶ 16.

BrightView's customers in the Northeastern United States are generally large commercial facilities and campuses, including, but not limited to: industrial facilities, corporate campuses, and office buildings; educational institutions (K-12 schools and colleges and universities); healthcare industry customers (hospitals, medical complexes, and long-term care facilities); hospitality industry customers (hotels, resorts, and theme parks); religious institutions (cemeteries and places of worship); retail institutions (shopping malls and mixed use facilities); sports and leisure customers (golf courses, sports complexes and fields, parks and public places); and large-scale residential customers (homeowner associations for residential communities, military housing, and multi-family housing).  Sacco Decl. ¶ 18; Am. Compl. ¶ 1.  BrightView does not sell its services to individual homeowners, who are referred to in the industry as "residential" customers.  Sacco Decl. ¶ 19.

### C. Mr. Sacco's Employment with BrightView

Beginning in January 2007, Mr. Sacco joined the Albany branch, located in Schenectady County, of The Brickman Group ("TBG") as an Operations Manager.  Sacco Decl. ¶ 6.  In that capacity, he was responsible for supervising the ground crews who delivered the contracted services to TBG's customers.  *Id.*  In 2014, TBG bought another commercial landscape company, Valley Crest Companies, that was headquartered in Calabasas, California. Sacco Decl. ¶ 7.  When the companies merged, the new company was rebranded as "BrightView Landscapes, LLC".  *Id.*

Mr. Sacco was promoted to Account Manager of the BrightView Albany branch in 2015, where he was one of two employees holding that position.  Sacco Decl. ¶ 8.  As an Account Manager, Mr. Sacco was the conduit between the customer and the Production Manager,

who supervised the crews performing landscaping services.  *Id.*  About 75% of Mr. Sacco's time was spent interacting with 25-30 commercial customers to which he was assigned regarding their service needs, satisfaction with BrightView's services, and renewals of service contracts.  *Id.*  Mr. Sacco spent 100% of his time as an Account Manager working in an office and never spent time in the field, which was the work of BrightView's Production Managers.  *Id.*

Mr. Sacco's training at BrightView was limited to BrightView's internal documentation and record-keeping for upsells to customers, as well as safety and efficiency in providing BrightView's services to customers.  *Id.* ¶ 9.  Mr. Sacco did not receive training on how to sell to new customers or upsell to existing customers.  *Id.*  The customers for which Mr. Sacco was responsible included GE Power and Water ($150,000/year), Albany Law School ($55,000/year), State Farm Insurance ($55,000/year), and property management companies on behalf of several homeowner associations ("HOAs") throughout the Albany branch territory.  *Id.* ¶ 20.

In BrightView's Albany, New York branch, the geographic region at issue here, BrightView's minimum contract value for its customers was $25,000 for services performed over a term of one, three, or five years.  Sacco Decl. ¶ 15. Mr. Sacco's territory in the Albany branch of BrightView covered the following New York counties, listed from north to south: Saratoga, Schenectady, Rensselaer, and Albany; he never worked in Warren County.  *Id.* ¶ 13.

### D.  Riverview's Business

Riverview is owned by Talus Group Holdings LLC ("Talus Group"), a family-owned investment firm, as well as one other limited liability company and several individual investors. Waterman Decl. ¶ 6.  Talus Group recognized the lawn care and landscaping market, which is estimated to be $100 billion, as an attractive investment platform.  *Id.* ¶ 5.  In particular, the market

is highly fragmented and consists of many providers, most of which have annual revenues of less than $10 million.  *Id.*

In 2022, Riverview purchased a small landscape business, Advantage Landscaping, with annual revenues of $1 million, located in Albany, New York, for $750,000, and branded the acquired business under the name of Riverview Landscapes.  *Id.* ¶ 6.  Due to the high retention rate of customers in the landscape business (approximately 90%), the strategy of Riverview has been to expand its market share by purchasing other small landscape companies in the northeastern United States, in the range of $1 million to $10 million of revenue.  *Id.*  Since 2022, Riverview has acquired 14 additional small landscaping businesses and currently operates from southern New Jersey to the Albany/Saratoga, New York area, as well as a small market in southeastern Massachusetts.  *Id.* ¶¶ 5, 6, Attachment A (map of the current service area of Riverview).

While Riverview provides some services similar to those of BrightView (e.g., lawn care/mowing, snow removal, pruning, landscaping, and tree and shrub maintenance), the scope and size of Riverview's customers and jobs differ in significant respects from BrightView.  Waterman Decl. ¶ 10.  BrightView's customers in the Northeast, where Riverview operates, trend toward very large commercial facilities and campuses (e.g., Massachusetts Institute of Technology, Boston Children's Museum, the National Mall in Washington, D.C., and Rose Kennedy Greenway).  *Id.*  In contrast, Riverview's Albany commercial customers are primarily HOAs, and small to medium size facilities such as apartment buildings, hospitals, and small business office parks. *Id.* Riverview also provides landscaping services to single-family homeowners, such as a single mow that costs less than $60.  *Id.*  BrightView does not service such residential customers or provide services in that dollar range.  *Id.*

### E.  Mr. Sacco's Termination from BrightView and his Employment with Riverview

In January 2025, Nick Mackey, the manager of Riverview's Albany branch, announced that he had accepted a job as the manager of BrightView's Albany branch beginning in early February.  Waterman Decl. ¶ 12.  Mr. Mackey emailed all his Riverview customers notifying them of his departure to BrightView and providing them with his personal email address.  *Id.*

In mid-February 2025, Riverview filled the vacancy that resulted from Mr. Mackey's departure from the role of the Albany Branch Manager with Curtis Tironi, who had been the Albany branch Operations Manager.  *Id.* ¶ 13.  The Branch Manager is responsible for sales, profit and loss management, ensuring safety, maintaining the equipment, and recruiting.  *Id.*  This left a vacancy in Riverview's Albany branch Operations Manager position.

At around the same time, Mr. Sacco was involuntarily terminated from BrightView on February 10, 2025, due to a single-vehicle accident in his company truck, when he lost control on an icy road and damaged the front end of the truck.  Sacco Decl. ¶ 21.  When he was terminated, Mr. Sacco was not provided with a copy of or told that he had signed the Agreement that is the basis for this lawsuit.  *Id.* ¶ 22.

Following his termination from BrightView and shortly after Mr. Tironi was promoted to the Albany Branch Manager position at Riverview, Mr. Sacco contacted Riverview's New York Regional Manager about the open Operations Manager position.  Waterman Decl. ¶ 14; Sacco Decl. ¶¶ 24-25.  Due to Mr. Sacco's extensive experience in the landscaping industry in general, and experience in particular with operations, Riverview hired Mr. Sacco for the Operations Manager position previously held by Mr. Tironi.  Waterman Decl. ¶ 15.  Mr. Sacco began employment with Riverview on March 3, 2025.  *Id.;* Sacco Decl. ¶ 25.

As the Operations Manager, Mr. Sacco's responsibility is to manage the ground crews and ensure Riverview's services are delivered to customers. Waterman Decl. ¶ 16. Mr. Sacco is also responsible for "upselling" to Riverview's existing customers, which is recommending and then securing a deal with a customer to provide any service that Riverview provides but that is not already in the customer's service contract. *Id.* Mr. Sacco is eligible for a bonus based on the gross margin of the service that he oversees to his existing customers. *Id.* He is not incentivized on new sales, which are handled by Riverview's Director of Sales. *Id*. ¶¶ 16, 17.

The service area of the Riverview Albany branch consists of the following counties (listed from north to south): Saratoga, Rensselaer, Albany, Schoharie, Columbia and Greene. Sacco Decl. ¶ 26. Within this area, the customer base of the Albany branch is largely residential. *Id.* ¶ 28; Waterman Decl. ¶ 18. The approximate composition of the customers in the Riverview Albany Branch are as follows: residential – 28 homes; commercial – six (6) HOAs, two (2) apartment building complexes, one hospital (limited to snow removal); one private college; and one cemetery. Waterman Decl. ¶ 18; Sacco Decl. ¶¶ 29, 30. The total revenue of the Albany Branch in 2024 was approximately $2 million. Waterman Decl. ¶ 18.

During the hiring process and his initial employment with Riverview, Mr. Sacco never told anyone at Riverview that he had signed an agreement at BrightView that would have restricted him from working for Riverview or from soliciting BrightView customers. *Id.* ¶ 19; Sacco Decl. ¶ 30. Moreover, Mr. Sacco has never been asked to solicit nor has he reached out to any BrightView customers since his termination from BrightView. Waterman Decl. ¶ 20; Sacco Decl. ¶ 32.

## F. BrightView Clients' Outreach to Mr. Sacco

Shortly after Mr. Sacco joined Riverview, he had contact with two BrightView customers whose accounts he had managed at BrightView. First, Mr. Sacco was contacted by Daughters of

Sarah ("DoS"), a senior living facility in Albany.  Sacco Decl. ¶¶ 32, 33; Waterman Decl. ¶ 20.  DoS was never under contract with BrightView but instead issued bids for specific projects.  Sacco Decl. ¶ 33.  BrightView performed three or four jobs for DoS over the past two years, which totaled less than $50,000.  *Id.*

On March 4, 2025, Mike Reagan, the Director of Operations at DoS, called Mr. Sacco on his cell to ask where Mr. Sacco was working because he had received a bounce-back message from Mr. Sacco's BrightView email address.  *Id.* ¶ 34.  Mr. Reagan and Mr. Sacco are personal friends and communicate often.  *Id.*  Mr. Reagan told Mr. Sacco that he had put out a bid for various kinds of landscaping work and was unhappy with BrightView's performance doing leaf clean-up for DoS the previous fall.  *Id.*  Mr. Reagan asked Riverview to bid on the project.  *Id.*  Riverview's bid for the DoS job was around $20,000.  *Id.* ¶ 36.  Riverview was awarded only part of the bid – mulching, spring cleanup, and planting flowers in the month of April – but was not awarded the portion for irrigation and tree work.  *Id.*; Waterman Decl. ¶ 20.  The bid document was prepared primarily by the Branch Manager, Curtis Tironi.  Sacco Decl. ¶ 35.  Mr. Sacco did not disclose to Mr. Tironi (or anyone else at Riverview) or use any BrightView confidential information in the course of Riverview's bid preparation.  *Id.*

The second BrightView customer with whom Mr. Sacco had contact was Saratoga Lofts, an apartment complex located in Malta, New York, in Saratoga County.  Sacco Decl. ¶ 37.  Mr. Sacco lives across the street from Saratoga Lofts.  *Id.*  On or about April 8, 2025, while looking at an apartment in the complex at the invitation of a friend, the maintenance manager for Saratoga Lofts, Greg Brownwell, whom Mr. Sacco knew from working at BrightView, saw Mr. Sacco and his Riverview truck.  *Id.*  Mr. Brownwell approached Mr. Sacco to say hello and commented that he had not heard from Mr. Sacco in a while and was unaware he had left

8

BrightView.  *Id.*  The conversation lasted about a minute and there was no mention that Mr. Brownwell was interested in Riverview's services nor any request for such services.  *Id.* To Defendants' knowledge, Mr. Brownwell is happy with BrightView's services, and Saratoga Lofts continues to be a BrightView customer.  *Id.*; Waterman Decl. ¶ 22.

### G.  BrightView's Cease and Desist Letter

In mid-May 2025, Mr. Sacco received from counsel for BrightView the letter attached to the Verified Complaint as Exhibit C.  Sacco Decl. ¶ 39.  The letter asserted that BrightView and Riverview are "direct competitors" and that Mr. Sacco was performing the "same or similar job duties" that he had done at BrightView in the same "geographic territory."  Am. Compl. Ex. C. The letter also said Mr. Sacco had "performed services on behalf of Riverview" for DoS and solicited Saratoga Lofts.  *Id.*  The letter accused Mr. Sacco of violating his obligations under the Agreement, which was attached to the letter.  *Id.*  The letter stated that BrightView expected Mr. Sacco to "abide by [his] obligations as set forth in the Agreement" and set a deadline of May 21, 2025 for him to provide BrightView with information about his job duties and territory at Riverview, his communications with DoS and Saratoga Lofts, his communications with other BrightView employees, and to reaffirm his commitment to abide by the Agreement and confirm he was not in possession of any BrightView confidential information.  *Id.*  Mr. Sacco forwarded the letter to Riverview management promptly after he received it. Sacco Decl. ¶ 39.  Riverview never received such a letter directly from BrightView. *See* Waterman Decl. ¶¶ 22, 24. The day that Riverview received the letter from Mr. Sacco was the first time Riverview became aware that Mr. Sacco was subject to a restrictive covenant agreement with BrightView.  *Id.* ¶ 22.

General Counsel of Talus Group, David Sadder, responded to counsel for BrightView, Jonathan Krause, on May 21, 2025, acknowledging receipt of the letter sent to Mr. Sacco.  *Id.* ¶

23, Attachment B.  In an email dated May 22, Mr. Sadder advised Mr. Krause that contrary to the allegations in the letter, Mr. Sacco had not solicited work from DoS or Saratoga Lofts.  *Id.*  With regard to the former, Mr. Sadder explained that DoS had reached out to Riverview to request a bid. *Id.*  He further stated that Riverview would agree to impose the following conditions on Mr. Sacco through February 10, 2027: (1) Mr. Sacco would be "prohibited from soliciting any account that would be in violation of his agreement with BrightView"; and (2) Mr. Sacco would be "prohibited from disclosing any confidential information concerning his BrightView account or any other BrightView confidential information."  *Id.*  Mr. Sadder confirmed that Mr. Sacco "does not have any BrightView business information or trade secrets in his possession."  *Id.*

The next communication Riverview received regarding Mr. Sacco's employment with Riverview was an email dated June 27, 2025, from Gregory Sellers, counsel for BrightView, to Mr. Sadder, with a copy of the Complaint and Motion for Preliminary Injunction and Expedited Discovery.  *Id.* ¶ 24.[2]

### III.    ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama,*

---

[2]    Around this same time, BrightView filed in April, May, June, and July, five (5) other cases similar to the instant case against five (5) former BrightView employees and their new employers alleging claims for (among others) breach of the employees' restrictive covenant agreements and tortious interference with contract. *See, e.g.*, *Brightview Landscapes, LLC v. Iatzko*, Case No. 2:25-cv-02013-KSM, filed April 21, 2025 (E.D. Pa); *Brightview Landscapes, LLC v. Ellis, et al.*, Case No. 2:25-cv-03204-JHS, filed June 24, 2025 (E.D. Pa); *Brightview Landscapes, LLC v. McDonough, et al.*, Case No. 1:25-cv-00827-RGA, filed July 3, 2025 (D. Del.); *Brightview v. Meredith, et al.*, Case No. 2;25-cv-02247-MKC, filed May 15, 2025 (E.D. Pa.); *Brightview Landscapes, LLC v. Radder*, *et al.*, Case No. 2:25-cv-03661-JHS, filed July 17, 2025 (E.D. Pa).

*Inc. v. Fed. Election Comm'n*, 575 F. 3d 342, 345-346 (4th Cir. 2009) (citing *Winter*, 555 U.S. at 20), *vacated on other grounds*, 130 S. Ct. 2371 (2010), *reinstated in relevant part*, 607 F. 3d 355 (4th Cir. 2010). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. For the reasons stated herein, BrightView's Motion for Preliminary Injunction should be denied because it cannot satisfy this test, and injunctive relief is not warranted.

### A. BrightView is Not Entitled to a Preliminary Injunction Because It is Not Likely to Succeed on the Merits of its Claims.

#### 1. BrightView is Unlikely to Prevail on its Claim for Breach of Contract.

##### a. The non-compete and non-solicitation clauses in the Agreement are not enforceable.

Under Maryland law, a restrictive covenant is a restraint on trade that will only be enforced if the following four requirements are met: (1) the employer must have a legally protectable interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy. *Holloway v. Faw, Casson & Co.,* 572 A.2d 510, 515-516 (Md. 1990). The enforceability of a restrictive covenant must be determined based on the scope of each covenant itself; if the restriction is not facially overbroad, then the facts and circumstances of each case must be examined. *Medispec v, Chouinard*, 133 F. Supp. 3d 771, 774-75 (D. Md. 2015) (Chasanow, J.). The restrictive covenants at issue in this case cannot meet the second and third of these requirements and, as such, no injunction should issue.

##### i.    *The restrictive covenants are overbroad as to BrightView's protectable interests.*

The Fourth Circuit Court of Appeals has long recognized that, pursuant to Maryland law, "employers have a legally protected interest in preventing departing employees from taking with

11

them the customer goodwill they helped to create for the employer." *MCS Services, Inc. v. Jones,* 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010) (citing *Deutsche Post Global Mail, Ltd. v. Conrad,* 116 F. App'x 435, 438 (4th Cir. 2004)). Thus, an employer may seek to prevent a former employee from "using the contacts established during employment to pirate the employer's customers." *MCS Services Inc.*, 2010 WL 3895380, at *3 (citing *Holloway,* 572 A.2d at 515). "On the other hand, mere protection from enhanced competition is not a protectable interest. A restrictive covenant is not enforceable if its sole purpose is to prevent a company's employees from joining another company, thereby making the new company a more efficient competitor." *MCS Services Inc.*, 2010 WL 3895380, at *3. Similarly, overbroad covenants not reasonably necessary to protect the valid interest are also unenforceable. *See Deutsche Post Global Mail,* 116 F. App'x at 438 (preventing "any kind of competition" by former employees is not legally protected).

The non-compete provision of the Agreement at issue is both facially and factually overbroad. It prohibits Mr. Sacco from being employed by any "Competing Business" where doing so would require him to provide the "same or substantially similar services." Agreement ¶ 5. "Competing Business" is defined in relevant part as any business "that is the same as, or substantially the same as, the Business of Brightview." *Id.* ¶ 1.b. The "Business of Brightview" is defined as "providing landscape and snow and ice services to Customers throughout the United States and Abroad, including landscape and sports turf design, construction, maintenance, and enhancement, tree care, water management and irrigation, and snow and ice removal and management." *Id.* ¶ 1.a. Nowhere in these provisions does BrightView identify the interest it seeks to protect in restricting Mr. Sacco's future employment with any other landscape business. For example, it does not limit the restriction to the use of BrightView confidential information or to providing services to BrightView customers. *Moonracer, Inc. v. Collard,* 2013 WL 4759262 at *2 (E.D.N.C. Sept. 4, 2013) (finding non-competition provision that barred employee from

12

engaging in any sales activity overbroad as it related to protection of employer's customer base); *see also Premier Rides, Inc. v. Stepanian*, 2018 WL 1035771, at *8 (D. Md. Sept. 23, 2018).[3]

Factually, under the current circumstances, the non-compete covenant is also overbroad because, to the extent it is premised on the protection of customer goodwill (as BrightView asserts in a conclusory manner (BV Mem., at 15), enforcing the covenant will not actually protect the goodwill Mr. Sacco earned with BrightView's customers during his employment with BrightView. Rather, BrightView is attempting to do exactly what the court held in *Holloway* is impermissible – prevent Mr. Sacco from becoming employed by any competitor.  At BrightView as an Account Manager, Mr. Sacco was a conduit between BrightView's customers and the production managers who managed the ground crews, where he spent 75% of his time "communicating with customers and relaying information between the customers and Production Managers, to ensure customer satisfaction."  Sacco Decl. ¶ 11.  The remaining 25% of his time at BrightView was spent on upselling to customers.  *Id.*  In contrast, here Mr. Sacco is responsible for the delivery of Riverview's services to its existing customers, where he spends nearly 100% of his time in the field overseeing the ground crews and upsells only "as the opportunity arises."  *Id.* ¶ 27.

Thus, in his role at Riverview, Mr. Sacco is not assisting Riverview to compete with BrightView and its customers.  BrightView has no protectable interest in preventing Mr. Sacco from working in a capacity in which he is not competing or taking advantage of BrightView's customer goodwill or confidential information.  Nor did Mr. Sacco receive any training at

---

[3]    It is notable that in its restrictive covenant agreements signed in more recent years, BrightView has narrowed the non-compete provision to the use of confidential information. *Compare* Ex. 3 and Ex. 4 (restrictive covenants filed in *Iatzko* and *Meredith* cases) ("that *would result in the use or disclosure of Confidential Information."*) (emphasis added) *with* Am. Compl. Ex. A, § 5.  BrightView also pleads this same language in the Amended Complaint (¶ 60), even though the language of section 5 (Non-Competition) of the Agreement does not say this.  Am. Compl. ¶¶ 39 and 60.

BrightView, other than on internal BrightView processes, or gain specialized skills while working at BrightView that would allow Mr. Sacco to unfairly compete against BrightView.  Sacco Decl. ¶ 9.  *See also Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 130 (2001) ("The essential purpose of the post-employment restraint . . . is not to prevent the competitive use of the unique personal qualities of the employee – either during or after the relationship – but to prevent competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of employment.") (quoting Blake, *Employee Agreements Not to Compete,* 73 Harv.L.Rev. 625, 647 (1960)); *Boisen v. Petersen Flying Serv., Inc.*, 222 Neb. 239, 246–47, 383 N.W.2d 29, 34 (1986) (Supreme Court of Nebraska held noncompete was unenforceable because the aerial spraying service failed to show any special circumstance affecting a legitimate business interest).

Lastly, on the facts here, the non-compete covenant is overbroad because BrightView and Riverview do not compete directly in the Restricted Territory.  As noted above, BrightView is the largest landscape company in the country, with an estimated market share of less than 3% and annual revenues of nearly $3 billion.  Because of its size and resources, BrightView provides many types of services that Riverview does not, such as design, construction, water management, maintenance of grass turf fields (e.g. large sports complexes and parks), and tree removal, which require aerial equipment such as bucket loaders and hydraulic lifts, and earth-moving equipment. Waterman Decl. ¶¶ 9, 10.  The extent of Riverview's "heavy" equipment is limited to small loaders and truck plows for snow removal, dump trucks, and skid steer/bobcat loaders for smaller landscaping projects.  *Id.* ¶ 9.

BrightView's customers in the Northeast, where Riverview operates, trend toward very large commercial facilities and campuses (e.g., Massachusetts Institute of Technology, Boston

14

Children's Museum, the National Mall in Washington, D.C., and Rose Kennedy Greenway). *Id.* In contrast, the customer base of the Riverview Albany branch is primarily residential single-family homes, which BrightView does not service at all. There are currently 28 residential homes for which Riverview's Albany branch provides mowing, weeding and pruning, and which average a few thousand dollars of services per year. Sacco Decl. ¶ 29. Upon request, Riverview will even provide such customers a single mow that costs less than $60. Waterman Decl. ¶ 10. None of these accounts approach the $25,000 minimum threshold BrightView requires for a customer. Sacco Decl. ¶ 15. Riverview's work is limited to landscape maintenance and service, snow removal, water and irrigation, and tree care; it does not do landscape design, it does not maintain large sports fields, and it does not perform tree removal. Waterman Decl. ¶ 9, 10. Simply put, while both companies operate in the $100 billion landscape industry, the majority of Riverview's business is not competitive with BrightView's. Due to the fragmentation of the industry, the difference in their customer base in the Albany area, and the monetary value of their typical services provided in this area, the degree of competitiveness between BrightView and Riverview is analogous to that between Jaguar and Hyundai. These companies both make cars, but they are not direct competitors; they do not market to the same consumers, their costs are widely disparate, and individuals shopping for one are almost never shopping for the other. The same is true as to BrightView and Riverview. *See Amazon.com, Inc. v. Moyer*, 417 F. Supp. 3d 1388, 1398 (W.D. Wash. 2019) (reforming overbroad non-competition agreement that prevented employee from providing services to customers in healthcare industry when his prior customers had been in financial services industry, finding that the customers were in "entirely different ecosystems").

15

ii.    *Enforcement of the non-compete covenant would impose an undue hardship on Mr. Sacco.*

The non-compete covenant is also unenforceable because it would unduly burden Mr. Sacco in his ability to earn a living and cause significant hardship to his family. The restricted area in this case is the 4-county area in which Mr. Sacco worked at BrightView, to wit, Saratoga, Schenectady, Rensselaer, and Albany. Sacco Decl. ¶ 13.[4]  At Riverview, Mr. Sacco's territory consists of the following counties:  Saratoga, Rensselaer, Albany, Schoharie, Columbia and Greene. *Id.* ¶ 26. Mr. Sacco lives within the Restricted Area in Saratoga County. *Id.* ¶ 2.

To begin, BrightView's casual comment that Mr. Sacco can remain employed by Riverview "outside of the Restricted Territory" completely disregards the realities of life for Mr. Sacco or any other individual in a similar position. To remain employed by Riverview outside of the Restricted Territory, Mr. Sacco would be required to either relocate entirely or commute 90 miles – approximately two (2) hours – each way in order to work from the nearest Riverview branch outside of the Restricted Territory, in Poughkeepsie, New York. Waterman Decl. ¶ 25; Sacco Decl. ¶ 2. Alternatively, Mr. Sacco would have to find employment in an industry other than landscaping closer to home. Neither is a viable option for him.

Mr. Sacco is not an executive earning a six or seven figure salary. Sacco Decl. ¶ 3. He is the parent of an eleven-year-old son over whom he shares custody with his ex-spouse, who lives approximately one hour's drive from Mr. Sacco. *Id.* ¶ 2. As part of his custody arrangement, every other Thursday Mr. Sacco picks up his son from school in Greenville, New York, where he lives with his mother, and has custody through Sunday evening. *Id.* ¶ 2. He is active in coaching his son's basketball and flag football teams and takes his son to practice three times a week and to

---

[4]    Mr. Sacco denies that he worked in or had customers located in Warren County as alleged in ¶ 2 of the Amended Complaint. *Id.*

games on the weekends.  *Id.*  His salary is used to support himself and his family (including through child support payments).  *Id.*  He does not have the option not to work, and he does not have a reasonable prospect of obtaining sustainable work outside the landscaping industry in which he has worked his entire adult life.  *Id.*  Alternatively, moving or commuting both would cause him to incur additional significant expenses and would make it nearly impossible for him to see his son regularly.  In short, losing his job, moving, or commuting two hours each way would impose an extraordinary burden on Mr. Sacco.  Under similar circumstances, courts have found the non-compete covenant to be unduly burdensome.  *See, e.g., United Rentals, Inc. v. Davison*, 2002 WL 31994250, at *3 (Md. Cir. Ct. July 23, 2002) (undue hardship on employee to prevent him from soliciting clients where he "lives and works in Central Maryland, and it would be virtually impossible for him to hold a position as a rental equipment salesman with any company in the vicinity and not come into contact with at least some clients . . .  Such a restriction would infringe on his ability to work and have adverse effects on both he and his family."); *see also Evans v. Facco USA, Inc.*, 2016 WL 304565, at *11 (N.D. Ala. Jan. 26, 2016) (finding hardship on individual of enforcing injunction outweighed harm to company, where employee had sold poultry products his whole life and would lose client relationships developed over years, whereas company had annual revenues of $50-60 million and would lose only a few million dollars).

  b.  **Mr. Sacco Has Not Breached the Agreement.**

To prevail on a claim for breach of contract, the plaintiff must show that (1) the defendant owed a contractual obligation to the plaintiff, (2) the defendant breached that obligation, and (3) the plaintiff suffered damages.  *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 345 (2011), *aff'd*, 426 Md. 185, 43 A.3d 1029 (2012)).

Because the non-compete provision of the Agreement is unenforceable for the reasons discussed above, the Court need not even address whether Mr. Sacco has breached the provision. However, even if this Court finds that the clause is enforceable, on the facts of this case, Mr. Sacco has not violated it. As discussed above, Mr. Sacco's work for Riverview plainly does not constitute "the same or substantially similar service" that he provided to BrightView. At BrightView, Mr. Sacco worked in an office and interfaced with his clients to determine what work was needed, how much those services would cost, and whether the clients were satisfied with the services provided to them. At Riverview, Mr. Sacco works in the field overseeing the performance of the actual landscaping services that are being provided to the customers. He does not communicate with customers about their contracts or payments; he receives instructions about work that is needed from other Riverview employees, who receive requests for work through a central online center. These jobs are simply too different to constitute a breach of the Agreement. *See Cynosure LLC v. Reveal Lasers LLC*, 2022 WL 18033055, at *10 (D. Mass. Nov. 9, 2022) (where employee's previous work involved sales and new employment involved managing daily functions of his new employer, court denied injunction on ground that former employer was not likely to succeed in showing employee was performing "same or similar services" for new employer).[5]

Nor has Mr. Sacco breached the non-solicitation provision of the Agreement. Am. Compl. Ex. B, ¶ 6. The Agreement states that Mr. Sacco will not "solicit, divert, or appropriate any Customer or accept any business from any Customer." *Id.* BrightView relies on two instances in

---

[5]      Even if the Court finds that BrightView is likely to demonstrate that Mr. Sacco has breached the non-compete provision, there is <u>no</u> evidence of damage from such breach. Separate from any potential solicitation (discussed further below), BrightView has not identified a single customer that has left BrightView to "follow" Mr. Sacco to Riverview or that has terminated its contract with BrightView based on an intent to move its services to Riverview. In short, Mr. Sacco's mere presence working for Riverview in the Restricted Territory has not caused <u>any</u> harm to BrightView.

which Mr. Sacco had contact with two BrightView clients he worked with while at BrightView – DoS and Saratoga Lofts.  As set forth in the Statement of Facts above, in both cases, the customers initiated contact with Mr. Sacco.  *See supra* pps. 8-9.  Regarding DoS, BrightView fails to mention that the customer put out for bid landscape work for spring clean up and planting, was not under any contract with BrightView like most of its customers, and BrightView was invited to bid on the project as well.[6]

Likewise, the second alleged breach BrightView points to involving Saratoga Lofts is even more suspect than the instance with DoS.  Again, as detailed above, Mr. Sacco lives across the street from the apartment complex and was approached by the Saratoga Lofts maintenance manager who spotted Mr. Sacco in his Riverview truck.  *See supra,* p. 9.  Mr. Sacco did not discuss any forthcoming work, Riverview's business, or anything similar in his one-minute conversation with the Saratoga Lofts manager.

In determining what constitutes a solicitation, in the absence of a definition in the contract, this Court has relied on "the common meaning of solicitation as defined in dictionaries." *Edelman Financial Engines, LLC v. Butera*, 2022 WL 2176850, at \*5 (D. Md. June 16, 2022) (citing definitions from Black's Law Dictionary ("'solicitation' as '[t]he act of or an instance of requesting or seeking to obtain something; a request or petition'") and the Merriam-Webster dictionary ("'to make petition to; to approach with a request or plea; to urge (as one's cause) strongly; to try to obtain by usually urgent requests or pleas.'")).  *Id.*  Other considerations include "who initiated the contact, whether the actions allegedly constituting solicitation were proactive

---

[6] To the extent BrightView contends that by submitting a bid to DoS Mr. Sacco violated the portion of the covenant that states he will not "accept any business from any Customer," there is no evidence that Mr. Sacco possessed such authority after only one-month into his position at Riverview to make such a decision.

19

or responsive, and whether the alleged solicitation involved active persuasion." *Id.* (citing *KPMG Peat Marwick LLP v. Fernandez*, 709 A.2d 1160, 1163 (Del. Ch. 1998)).

Applying these principles here, Mr. Sacco clearly did not "request," "petition" or "plea" with either DoS or Saratoga Lofts, nor was he "proactive" or engaging in "persuasion" in these activities. In the clear absence of any "solicitation" by Mr. Sacco, BrightView will be unable to establish a claim for breach of contract.[7]

The last breach of the Agreement BrightView alleges is the Non-Disclosure and Non-Use of Confidential Information and Trade Secrets. Am. Compl. Ex. A, § 3. BrightView asserts: "[u]pon information and belief, the services that Sacco is providing for Riverview is resulting, or will result in, the use or disclosure of BrightView's Confidential Information." *Id.* ¶ 75. The Amended Complaint and BrightView's Memorandum, however, are devoid of any facts in support of this allegation. Mr. Sacco and Riverview both deny ever using any confidential information of BrightView in the course of Mr. Sacco's employment with Riverview. Sacco Decl. ¶ 38; Waterman Decl. ¶ 23. The absence of any facts to support a claim for breach of the non-disclosure of confidential information bars BrightView from establishing a breach of contract claim on this provision.

### 2. BrightView is Unlikely to Prevail on its Claim for Tortious Interference.

With respect to the non-solicitation provision, BrightView's claim for tortious interference with contractual relations against Riverview fails as a matter of law because BrightView is unable to show – and pleads only "on information and belief" – that Riverview was aware of Mr. Sacco's restrictive covenant agreement at the time of the alleged "solicitations." Am. Compl. ¶ 88.

---

[7]   As noted above, Saratoga Lofts has never been a client of Riverview and remains a client of BrightView. *See supra,* p. 9. Therefore BrightView cannot prove any damages based on this communication, which is a necessary element for a breach of contract claim.

Mr. Sacco and Mr. Waterman, the CEO of Riverview, have both provided testimonial evidence via their declarations in support of Defendants' opposition that Mr. Sacco never told anyone at Riverview that he was subject to a restrictive covenant agreement during the interview and hiring process at Riverview or thereafter. Sacco Decl. ¶ 31; Waterman Decl. ¶¶ 19, 22. The first time Riverview was aware of the existence of the Agreement is when Mr. Sacco forwarded to his supervisors the letter from BrightView's counsel dated May 14, 2025, which was over two months after DoS requested bids from Riverview, BrightView, and another company, and one month after Mr. Sacco ran into the Saratoga Lofts manager on the street. Sacco Decl. ¶¶ 34, 39.[8] Therefore, Riverview could not have interfered with BrightView's relationship with DoS and Saratoga Lofts because it did not know about the Agreement at the time of the interactions between Mr. Sacco and these third parties. *See, e.g., Bindagraphics, Inc. v. Fox Grp., Inc.,* 377 F. Supp. 3d 565, 577 (D. Md. 2019) (dismissing a tortious interference claim regarding a non-solicitation provision where a former employer "put forth no facts alleging that [defendant] knew of the nonsolicitation provision in [employee's] contract with [former employer] at the time of the alleged breach"). And, as discussed further above, BrightView cannot prove the fourth element of the tort – breach of the contract – because Mr. Sacco's contacts with DoS and Saratoga Lofts did not constitute breaches of the Agreement.

BrightView's contention that Riverview has tortiously interfered with the non-competition provision of BrightView's contract with Mr. Sacco fares no better. First, as discussed above, the non-compete provision is overbroad and not enforceable. In the absence of an enforceable contract

---

[8]     BrightView never sent a letter to Riverview regarding Mr. Sacco's restrictive covenant obligations or alleged violation thereof. Waterman Decl. ¶¶ 23, 24. Upon receipt of the letter from Mr. Sacco, Riverview's in-house counsel immediately reached out to BrightView's counsel to provide assurances that Mr. Sacco had not solicited any BrightView customers or used any BrightView confidential information, nor would he do so in the future. *Id.* ¶ 24.

between BrightView and Mr. Sacco, BrightView is unable to satisfy the first element of the tort. Second, even after Riverview became aware of the Agreement in May 2025, Mr. Sacco has not breached the non-compete provision because he is not providing the "same or substantially similar services" at Riverview that he provided while at BrightView. And finally, as noted above, Mr. Sacco's merely having accepted employment with Riverview in the Restricted Territory has not caused any actual damage to BrightView.[9]

Based on the foregoing, it is clear that BrightView is unlikely to succeed on the merits of its claims for breach of contract and tortious interference against the Defendants. As such BrightView's request for an injunction should be denied.

### B. BrightView is Not Entitled to A Preliminary Injunction Because It Cannot Establish Irreparable Harm if the Injunction Does Not Issue

BrightView's assertion that it will suffer irreparable harm without an injunction is belied by both the law and the facts of this case. Courts have repeatedly found that pure economic injury, such as that resulting from lost sales or a lost customer, does not constitute irreparable harm sufficient to warrant injunctive relief. *See SouthTech Orthopedics v. Dingus*, 428 F. Supp. 2d 410, 418 (E.D.N.C. 2006); *see also ForceX v. Technology Fusion*, 2011 WL 2560110, at *7 (E.D. Va. June 27, 2011) (applying irreparable harm standard for injunctions to motion for expedited discovery). As the *ForceX* court explained, loss of customers or goodwill "is not an unusual type of harm. In all cases where a defendant is breaching their contract or non-compete agreement, the plaintiff faces a risk of lost revenues or clients. The very point of non-compete agreements, and the litigation that follows in the wake of a breach of a non-compete agreement are remedies to this

---

[9]    It is not clear if BrightView is arguing that Riverview has caused Mr. Sacco to breach the Agreement by disclosing or using BrightView's confidential information. *See* BV Mem., at 20. But for reasons discussed above, such an argument would fail because BrightView has included no allegations indicating that Mr. Sacco has breached the non-disclosure provision of the Agreement, and he has not.

harm." *Id.*; *see also SouthTech*, 428 F. Supp. 2d at 418 (fact that sales were down in former employee's territory was insufficient to show irreparable harm). By contrast, courts have found irreparable harm "where a defendant's conduct threatens to cripple or substantially alter a going concern." *SouthTech*, 428 F. Supp. 2d at 418.

In this case, BrightView has identified a single "customer" for which it has allegedly "lost" a sale during the four-month period since Mr. Sacco accepted employment with Riverview. As discussed above, DoS did not have an ongoing contract for services with BrightView, but engaged the company for one-off projects from time to time on an as-needed basis. In March 2025, it requested bids from three companies – BrightView, Riverview, and a third – on various projects, some of which Riverview won and others of which it did not. To the extent that this circumstance constitutes the "loss" of a sale or customer, the damage is eminently quantifiable, and it is certainly not a "crippling" loss for BrightView. BrightView's annual revenues are in the billions, and the work that Riverview was awarded by DoS valued approximately $20,000. If the Court were to find that Defendants are liable in connection with this bid or some other similar lost customer or contract in the future, BrightView can easily recover monetary damages for the harm.

More importantly, though, BrightView has not identified any real threat of future loss, let alone irreparable harm. It alleges in a conclusory manner that Mr. Sacco will use the customer goodwill he developed at BrightView to solicit BrightView customers and harm BrightView "in an immeasurable manner." *See* Motion, at 21. But the irreparable harm to plaintiff "must be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). Defendants have committed that Mr. Sacco will not solicit any BrightView customers. More importantly, BrightView has not identified a single other client that has cut off business with BrightView to engage Riverview (even absent any solicitation by

23

Riverview), or that has even hinted at doing so. *See Nicklas Associates v. Zimet*, 2014 WL 6984138, at \*5 (D. Md. Dec. 9, 2014) (plaintiff could not show irreparable harm where four months had passed since it had learned of defendant's employment with competitor, and plaintiff could not identify a single incident where plaintiff lost a customer because of defendant's solicitation). To succeed in showing irreparable harm, BrightView would have to identify a much more significant loss or a credible risk of a much more significant loss than a single \$20,000 contract. *See Wachovia Ins. Services, Inc. v Hinds*, 2007 WL 6624661, at \*3 (D. Md. Aug. 30, 2007) (irreparable harm shown where several customers had already left former employer, taking \$425,000 in annual revenues, and where additional large clients threatened to leave, which would take another \$232,000 in revenues). It plainly has failed to do so.

Finally, BrightView's argument that Mr. Sacco will use the confidential information he learned from BrightView to gain an unfair competitive advantage is also without merit. *See* BV Mem., at 21. BrightView has provided <u>no</u> evidence that Mr. Sacco has disclosed any confidential information, and Defendants have committed that he has not retained copies of such information and will not use any information he may recall. Waterman Decl. ¶ 24; Sacco Decl. ¶¶ 31, 32, 38. BrightView's argument relies on the "inevitable disclosure" doctrine that simply assumes Mr. Sacco will be forced to use confidential information in the course of his Riverview employment. But this doctrine is not accepted by Maryland courts. *LeJeune v. Coin Acceptors*, 381 Md. 288, 318-22, 849 A.2d 451, 469-72 (2004). Indeed, this argument necessarily relies on Mr. Sacco performing the same work for Riverview that he performed for BrightView, where such confidential information would prove helpful to him. But he is not: rather than interfacing with clients regarding pricing, specifications, and the like, Mr. Sacco is out in the field overseeing the performance of the actual landscaping work. The negligible risk of disclosure or use of

24

confidential information under these circumstances is plainly insufficient to demonstrate the irreparable harm necessary to justify the extraordinary remedy of a preliminary injunction.

## C. The Balance of the Equities Weighs Against Issuing an Injunction

BrightView's assertion that Defendants will not suffer "any" harm from issuance of the injunction (BV Mem., at 22) is both disingenuous and unsupported by the law. As discussed above, enforcement of the covenant would place an extraordinary burden on Mr. Sacco.

In contrast, BrightView has not shown that it would suffer irreparable harm without an injunction. It bases its argument on speculation and the conclusory assertion that the damage it may suffer from losing customers and goodwill is immeasurable. As noted, however, the damage from a lost contract is easily measurable in dollars, and those dollars are the proverbial "drop in the bucket" for a company of the size and value of BrightView. Plus, BrightView has identified no credible future harm or threat of future harm. Besides one open bid by DoS, no customers have sought to leave BrightView to follow Mr. Sacco. And Defendants have committed that Mr. Sacco will not solicit any BrightView customers or disclose or use any confidential information, and have further shown that his job at Riverview is not the same as his job at BrightView. For all these reasons, BrightView also has not shown that it is likely to succeed on the merits of the case. Issuing the injunction to prohibit Mr. Sacco from working in the landscaping industry in the Restricted Territory would therefore serve no justice but would instead cause undue and unfair consequences to a mid-level employee simply trying to make a living and support his family.

Courts have regularly found in similar circumstances that the equities favor the defendant employee rather than the plaintiff former employer. *See, e.g., TTEC Holding, Inc. v. Da Silva*, 2020 WL 7398775, at \*4 (D. Colo. Dec. 16, 2020) (balance of equities strongly favored the defendant employee where the employer's alleged harm was "purely speculative and unsubstantiated" and the employee would be required to leave his employment for a year and lose

income and health insurance coverage); *Wausau Mosinee Paper Corp. v. Magda*, 366 F. Supp. 2d 212, 223 (D. Me. 2005) (where employee testified he had and would continue to honor a non-disclosure agreement, employee would suffer more from an order to discontinue employment than it would benefit his former employer; employee was sole breadwinner, his family was dependent on his salary and health care benefits, his son was facing surgery, and the new employer was the only one in his specialty within a reasonable travel distance).

Beyond the facts outlined above, additional circumstances at issue here tip the balance of equities in Defendants' favor.  First, Mr. Sacco did not resign to accept employment with Riverview.  He was terminated by BrightView, not because of poor performance or any work-related misconduct, but because he had a one-vehicle accident in his BrightView truck where it slid on an icy road and crashed into a snowbank.  Sacco Decl. ¶ 21.  In other words, unlike in many cases where employees voluntarily leave for competitors, Mr. Sacco suddenly and unexpectedly found himself without a job after working for BrightView for eighteen years, and given that he has worked in landscaping his entire life, sought a position he believed he could secure quickly to minimize disruption to his livelihood.  *Cf. Marinelli v. Medco Health Sols., Inc.*, 951 F. Supp. 2d 303, 321 (D. Conn. 2013) (in analyzing enforceability of restrictive covenant, more likely to find undue hardship to employee where the employer terminates the employee than when the employee voluntarily resigns his employment).

Second, BrightView has evidenced a lack of good faith on multiple occasions.  When Mr. Sacco was terminated, it did not provide him a copy of his non-competition agreement or remind him of the obligations it contained.[10]  Sacco Decl. ¶ 22.  The DoS bid of which BrightView

---

[10]  Defendants are not even certain that the Agreement at issue in this case is the operative one.  Mr. Sacco believes he signed a second agreement within the last two years, but he does not

complains occurred in March 2025, but BrightView did not contact Mr. Sacco about his restrictive covenant obligations until two months later, in May 2025. *Id.* ¶¶ 34, 39. Notably, BrightView did not contact Riverview, the entity that would have had the knowledge and resources to better respond to a demand letter, nor did it provide Riverview a copy of the Agreement to put Riverview on notice of Mr. Sacco's purported obligations. Waterman Decl. ¶ 22. Then, after receiving the letter and Agreement from Mr. Sacco, Riverview's counsel attempted to negotiate a resolution to the matter, but BrightView's counsel never responded and instead simply filed this lawsuit. *Id.* ¶ 23. In short, whereas Mr. Sacco acted with no malice or intent to harm by simply seeking to obtain employment in the only industry he knows following termination, BrightView has attempted to avoid meaningful communication about the dispute that could lead to resolution, choosing instead a scorched earth tactic of filing multiple lawsuits and demands for injunctions against departing employees around the country, including Mr. Sacco. *See supra* p. 10, fn. 2.

### D.  The Public Interest Weighs Against Issuing an Injunction

No public interest is served by issuing an injunction preventing Mr. Sacco from working for Riverview in the Restricted Territory when BrightView is unlikely to succeed on the merits or suffer irreparable harm in the absence of an injunction, whereas Mr. Sacco's life will be turned upside down from such an order. Moreover, neither the state of New York (where Mr. Sacco lives and works and the facts of this matter unfolded) nor the state of Maryland (where this Court sits and whose laws governs the Agreement) would favor such an injunction.

In June 2025, the New York legislature passed a bill that would prohibit non-competition restrictions in agreements between employers and employees earning less than $500,000 per year.

---

have a copy of any of the agreements he signed with BrightView, which would have been provided to him on his BrightView email to which he no longer has access. *See* Sacco Decl. ¶ 23.

*See* Senate Bill S4641.[11]    Although the bill would not apply retroactively, if passed, a non-competition provision similar to the one included in the Agreement would be unlawful going forward for individuals like Mr. Sacco and the vast majority of other New York employees as well. While the bill must still be approved by the Assembly Labor Committee and signed by the New York governor, the bill's advancement to this stage demonstrates the public interest in prohibiting employment restrictions that impose such a great burden on regular citizens.  Furthermore, in Maryland, there is already a law in place that prohibits non-competition agreements for workers earning less than $46,800 annually.  *See* Md. Code Ann., Lab. & Empl. § 3-716(a)(1)(i)(1) and 3-413(c)(1)(ii).  While Mr. Sacco's salary is higher than the threshold, this law demonstrates that Maryland too looks with some disfavor on such restraints on trade.  Although Defendants concede that Mr. Sacco would be bound by the obligations in the Agreement *if* the Court finds in BrightView's favor on its claims because the Agreement is governed by Maryland law and Mr. Sacco's salary exceeds the threshold for the statutory non-compete ban, these bills and laws representing the public policies of the relevant states to exercise restraint in the enforcement of restrictive covenants weigh against the issuance of a preliminary injunction before this Court has the opportunity to reach the merits of the case.

For all the above reasons, BrightView's request for an injunction and expedited discovery should be denied.  *See L'Occitane, Inc. v. Trans Source Logistics, Inc.,* 2009 WL 3746690 at *2 (D. Md. Nov. 2, 2009) (expedited discovery denied where plaintiffs "[did] not demonstrate how the discovery will provide evidence to establish the likelihood of the irreparable harm alleged.").

---

[11]    Available at  https://www.nysenate.gov/legislation/bills/2025/S4641/amendment/original.

**E. The Court Should Require BrightView to Post a Significant Bond if an Injunction is Issued**

BrightView correctly states that this Court has the discretion to set a bond in the amount it deems proper if it issues a preliminary injunction against Defendants. However, in so doing, the Court "should be guided by the purpose underlying [Federal] Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 861 (D. Md. 2025). This inquiry "ordinarily depends on the gravity of the potential harm to the enjoined party." *Id.*

It is no surprise that BrightView believes $1,000 will compensate Mr. Sacco and Riverview for the harm they will suffer if the injunction is wrongly issued (*see* BV Mem., at 25) because BrightView has otherwise failed to appreciate the impact on Mr. Sacco of an injunction. He cannot simply work for Riverview outside the Restricted Territory – that would mean a commute of four hours total each day, or relocation to a county 90 miles away from his family. Furthermore, he cannot do a job for Riverview within the Restricted Territory that does not relate to providing landscaping services to customers, either in operations or sales, as the Albany branch is the only branch in the Restricted Territory. And Mr. Sacco does not have the education or expertise to find a job that would provide him comparable pay and benefits within the Restricted Territory in an industry *other* than landscaping. Thus, the effect of issuing the injunction is that Mr. Sacco will be unable to work altogether. Given that the non-compete restriction lasts for one year, the appropriate bond must account for at least one year of Mr. Sacco's salary of $93,500. *See Rimsys, Inc. v. Cohn*, 2023 WL 7181771, at *4 (W.D. Pa. Sept. 15, 2023) (requiring injunction bond in the amount of one year of defendant employee's salary); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1156 (D. Kan. 2007) (requiring bond equal to two years of

29

employee's salary where court issued a preliminary injunction and non-compete restricted employee's activities for two years).

Furthermore, Riverview must be compensated for the cost it will incur to replace Mr. Sacco, both in terms of costs for recruiting and hiring a new employee, and for the lost revenue caused by the disruption to services in the Albany branch during any period in which it has no Operations Manager. *See EIS Ultimate Holding, LP v. Huset*, 2024 WL 4472008, at *19 (D. Colo. Sept. 19, 2024) (setting $500,000 bond "in an attempt to cover at least some of Defendants' lost profits for contracts they are unable to accept"). Riverview estimates that this amount would total approximately $50,000.

Thus, Defendants respectfully request that if this Court chooses to issue an injunction that prevents Mr. Sacco from performing his current job in the Restricted Territory, such injunction shall be contingent on BrightView posting a bond of $150,000. *See also EIS Ultimate Holding*, 2024 WL 4472008, at *19 (recognizing that courts typically require "relatively larger" bonds when imposing non-compete style injunctions) (citation omitted).

## IV.    CONCLUSION

For all the foregoing reasons, Defendants respectfully request that Plaintiff's motion for preliminary injunction and expedited discovery be denied.

30

Dated: August 6, 2025                    Respectfully submitted,

                                         /s/ *Steven W. Ray*
                                         Steven W. Ray, D. Md. Bar No. 13410
                                         Christine M. Burke, D. Md. Bar No. 10998
                                         ISLER DARE, P.C.
                                         1945 Old Gallows Road, Suite 650
                                         Vienna, Virginia 22182
                                         Phone: (703) 748-2690
                                         Facsimile: (703) 748-2695
                                         sray@islerdare.com
                                         cburke@islerdare.com

                                         *Counsel for Defendants Peter Sacco*
                                         *and Riverview Companies Northeast LLC*
                                         *d/b/a Riverview Landscapes*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Scott A. Levin (I.D. No. 2109080013)
Jonathan S. Krause (*pro hac vice*)
Gregory R. Sellers (*pro hac vice*)
Klehr Harrison Harvey Branzburg LLP
1935 Market Street, Suite 1400
Philadelphia, PA 19103
slevin@klehr.com
jkrause@klehr.com
gsellers@klehr.com

*Counsel for Plaintiff BrightView Landscapes, LLC*


            /s/ *Steven W. Ray*
Steven W. Ray, D. Md. Bar No. 13410
Christine M. Burke, D. Md. Bar No. 10998
ISLER DARE, P.C.
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
Phone: (703) 748-2690
Facsimile: (703) 748-2695
sray@islerdare.com
cburke@islerdare.com

*Counsel for Defendants Peter Sacco*
*and Riverview Companies Northeast LLC*
*d/b/a Riverview Landscapes*